(No. 4856

HATTIE MITCHELL, Administratrix of the Estate of SELMA MITCHELL, Deceased, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 9, 1965.*

PERRY, EUBANKS AND WOOLFORD and CHAUNCEY ESKRIDGE, Attorneys for Claimant.

WILLIAM G. CLARK, Attorney General; EDWARD A. WARMAN AND LESTER SLOTT, Assistant Attorneys General, for Respondent.

227

Dove, J.

Claimant, Hattie Mitchell, as Administratrix of the Estate of Selma Mitchell, deceased, filed her complaint in this Court on January 29, 1959 seeking an award for the wrongful death of her daughter, Selma Mitchell, who died on November 17, 1958, while a patient at the Chicago State Hospital, an institution for the mentally ill, operated by the State of Illinois. Claimant seeks an award of $25,000.00.

From the evidence it appears that the decedent, Selma Mitchell, at the age of twenty-two, died at the Chicago State Hospital following a fight on November 17, 1958 between the decedent and one Alice Ambrose, a ward attendant; that the decedent was subdued into unconsciousness by the use of wet towels wrapped around her neck; and, that she was given an injection of a drug after she had been subdued, and was pronounced dead approximately three hours later.

The evidence further discloses that Selma Mitchell, the decedent, had had a normal birth, and appeared to be a normal child in every way until the age of eight, at which time she began to have epileptic seizures. When she was nine years of age, she fell into the stove, and her clothing caught fire, seriously burning and disfiguring her from the neck down to her hips. From the age of nine through twenty-one, she was a patient at the Dixon State Hospital as a result of epileptic seizures, and her mother's inability to properly care for her at home. The evidence discloses that Selma's mental age was between five and seven years, and that she could take care of her own self, i.e. eating, washing, and dressing. She could do menial labor tasks such as cleaning and mopping floors. The evidence further dis-

closes that, as Selma reached adolescence and physical maturity, she developed, emotional and antagonistic behavioral patterns, and occasionally had fights with other patients and supervisory personnel. As a result of the behavioral patterns, and upon request of Hattie Mitchell, Selma was transferred from the Dixon to the Chicago State Hospital in September, 1958.

The full medical history of Selma Mitchell was transferred with her to the authorities at the Chicago State Hospital, and the medication for her tantrums and the control of her epilepsy seizures was prescribed and continued. Selma was assigned to Ward CW9 in the Chicago State Hospital, which was considered to be the control ward for the seriously disturbed epileptic patients.

Ward CW9 on the day in question had forty-five patients and one ward attendant, Mrs. Alice Ambrose, age forty-one. At approximately 9:00 A.M., Mrs. Ambrose told Selma and two other girls to start swabbing the floor. Selma did not want to do so, but reluctantly complied. The evidence discloses that some discussion was had between them, and that Selma called Mrs. Ambrose a "bitch." The evidence further discloses that Mrs. Ambrose then called Selma a "bitch," and a fight ensued. When other patients attempted to help Mrs. Ambrose, she said she would take care of Selma herself. She asked another patient to get the "persuader," which was a wooden-handled radiator brush approximately eighteen inches long. One of the patients brought Mrs. Ambrose the "persuader," and the evidence then discloses that Mrs. Ambrose got on top of Selma Mitchell, and commenced hitting her upon the head and body with the "persuader," eighteen to twenty times until she broke the "persuader." Then Mrs. Ambrose told another patient to go get a wet towel, which was put around Selma Mitchell's neck, and twisted in the back until it was tight.

Mrs. Ambrose then got behind Selma, pulled her to her feet, and asked her if she would stop fighting. One of the witnesses stated that at this time Selma was clawing at the towel, her mouth was open, and her eyes protruded. She made no answer, and Mrs. Ambrose then said: "Well, when I get you restrained against the post you will stop," and proceeded to walk Selma to the post in the center of the room about eighteen feet away. While they were approaching the post, Selma was clawing at the towel, her mouth was open, and her eyes protruded. When they got about a foot from the post, Selma collapsed. Mrs. Ambrose then had another patient go to the clothes room to get restraints, and tied Selma to the post in a squatting position. At this time Selma's head was hanging down, and Mrs. Ambrose told another patient to hold the towel around Selma's neck while she went to prepare a needle, she administered a tranquilizer to Selma by injection in the buttocks.

The evidence further discloses that Mrs. Ida Booten, R.N., a supervisor, came into room about this time together with a Mrs. Fleming, an attendant in another ward, and a Mrs. Oxford. One of the attendants helped Mrs. Ambrose administer the tranquilizer. Mrs. Booten, the supervisor, did not say anything, and they took Selma out of the restraints, and helped put her to bed. At the hearing, a witness testified that Mrs. Ambrose was trying to get Selma's pulse, but was unable to do so.

About 11:00 A.M., or approximately an hour after Selma was choked into unconsciousness, and before the patients went down to eat, one went over to Selma's bed, and said she could not get a pulse, and stated "she is cold." Mrs. Ambrose said: "Well, that is because the door is open."

The doctor was not called, but came on his ward rounds at 1:15 P.M. At that time Mrs. Ambrose met him at the door, and told him what had happened. He wrote in the

day book, and then went off the ward without looking at Selma who was still in bed. Mrs. Ambrose then went over to Selma's bed, and said to another patient: "Call the doctor back. I can't get a pulse on Selma." The doctor returned in about fifteen minutes, and pronounced her dead.

The evidence further discloses that such treatment of patients by the ward supervisor in question and other hospital personnel, i.e., beating them with a "persuader," and subduing them into unconsciousness by twisting a wet towel around their necks, was not an unusual occurrence at the Chicago State Hospital, and that Mrs. Ambrose had done this many times before.

Following the pronouncement of Selma's death, no investigation was made by the Chief Nurse, Frieda Axen, R.N., until the next day when Mrs. Booten told Miss Axen that "her conscience wouldn't let her rest; that it wasn't right." The Superintendent, Dr. J. H. Maltz, had an informal discussion with Mrs. Ambrose and other personnel to try to determine the facts. The original medical certificate of death, listing the cause of death as natural causes was superseded by the pathological report or autopsy showing, that the immediate cause of death was acute pulmonary edema.

On July 2, 1958, the Superintendent of the Dixon School had advised Selma's mother as follows:

"Dear Mrs. Mitchell:

"In reply to your letter regarding your daughter, Selma, we wish to inform you that she is in good physical condition. She eats and sleeps well, but her psychic condition is stationary.

Very truly yours,

DIXON STATE SCHOOL,
W. R. HANDY, Acting Superintendent

By: /s/ V. ULUHOGIAN, M.D."

Some five months later, Selma was dead.

Included in the pathological report of the Cook County

Coroner was the statement: "Died at 1:30 P.M. under odd circumstances."

Handicapped though she was with a stiffened arm as a result of her burns as a child, there is evidence that Selma was able to do menial labor and cleaning, and was able to take care of herself, both inside and outside the institution.

It is not conclusive, in the Court's opinion, that Selma would not be able to contribute to her mother's financial support in the latter's old age.

This Court is appalled by the unconscionable conduct and negligence in this instance of persons entrusted by the State of Illinois with the care of inmates of a State institution. It is difficult to understand, and impossible to accept, the course of conduct reflected by the evidence in this case. It is the responsibility of the State and its employees to provide a reasonable and humanitarian care for these less fortunate persons, and this responsibility was not met.

The evidence indicates that Selma's life expectancy would be approximately eight to thirteen years. If employed for ten years, and able to work one-half of the time at wages of $40.00 per week, Selma could have earned approximately $1,040.00 per year, or in ten years a total amount of $10,-400.00. Approximately one-half of this amount for the mother's support would justify an award of $5,000.00; a further allowance of $500.00 for funeral expenses, which were incurred by Selma's mother, should also be made.

An award to claimant, Hattie Mitchell, as Administratrix of the Estate of Selma Mitchell, Deceased, is, therefore, made in the sum of $5,500.00.